# IN THE COURT OF APPEALS OF IOWA

No. 24-0534
Filed June 5, 2024

**IN THE INTEREST OF E.C.-K.,**
**Minor Child,**

**B.C., Mother,**
　　Appellant.

_____

Appeal from the Iowa District Court for Jefferson County, Patrick McAvan, Judge.

A mother appeals the termination of her parental rights to her child. **AFFIRMED.**

Patricia J. Lipski, Washington, for appellant mother.

Brenna Bird, Attorney General, and Mackenzie Moran, Assistant Attorney General, for appellee State.

Katie E. M. Lujan of Washington Law Office, LLP, Washington, attorney and guardian ad litem for minor child.

Considered by Badding, P.J., and Chicchelly and Buller, JJ.

**CHICCHELLY, Judge.**

A mother appeals the termination of her parental rights to her child, E.C.-K., born in March 2023.[1]  She challenges the State's reasonable efforts, statutory grounds for termination, and determination that termination is in the child's best interests.  She also argues that a six-month extension should have been granted.  Upon our review, we affirm termination of the mother's parental rights to E.C.-K.

## I.    *Background Facts and Proceedings.*

The Iowa Department of Health and Human Services (HHS) became involved with E.C.-K. at birth when his umbilical cord tested positive for methamphetamine.  Both the mother and father denied drug use, although the mother later testified her sobriety date is June 17, 2023, or three months after E.C.-K.'s birth.  The juvenile court removed E.C.-K. from the parents' custody at twelve days old and placed him with a foster family, citing both the substance-use allegations and the parents' prior termination proceedings as grounds for removal.[2]  He was adjudicated a child in need of assistance in May 2023.

After E.C.-K. was removed, HHS tried to contact the mother to arrange services, and the mother "presented odd behaviors and was issuing threats to HHS."  Because of her previous interactions with the juvenile court system, the mother claimed "[HHS] and the county attorney simply have a vendetta against

---

[1] The father's parental rights were also terminated to E.C.-K. at the same time. Since he does not appeal, we do not consider him in our analysis.

[2] The father's parental rights to a child shared with the mother and the mother's parental rights to two other children were terminated in November 2022.  Because the mother's rights to E.C.-K. were terminated under Iowa Code section 232.116(1)(g) (2023), which requires a prior termination "to another child who is a member of the same family," the court took judicial notice of these proceedings.

her, and wish to take her child away from her" and "that [the county attorney] decided to destroy her entire life." Throughout their interactions with the mother, service providers described her engaging in "defiant angry outburst[s]" and becoming "aggressive and combative" when they would give her direction. The HHS provider and the mother further disagreed about a key issue, which started several conflicts: E.C.-K.'s name. The provider used E.C.-K.'s legal name, which he "recognizes [as] his own name, and associates . . . with himself." But the mother preferred to use another name for him and wanted to legally change it. When the HHS provider used his legal name around her, the mother "yelled, 'his fucking name is not fucking [E.C.-K.]'" and "stormed out."

Throughout the life of the case, the mother has not had stable housing; she was either homeless or in residential treatment, jail, or a halfway house. Days after E.C.-K.'s removal from her custody, the mother admitted herself into Hope House for inpatient substance-use treatment. She was unsuccessfully discharged on May 22 after violating multiple facility rules. This included disciplining another resident's child and leaving E.C.-K. alone and unsupervised at the facility to spend time with the father. Hope House staff also expressed concern to HHS about the mother's parenting ability after she ignored directions to bathe and dress E.C.-K. appropriately. The residential "staff found [E.C.-K.] freezing, in only a thin onesie, his feet and lips were blue." On another occasion, staff found E.C.-K. "alone, screaming, in his stroller, there inside the facility, with [the mother], nowhere to be found." She was asked to leave.

While she was in treatment, the mother was evicted from her apartment. After she was asked to leave Hope House, she slept in a tent at a local

campground with the father. The department had several concerns about the parents' living conditions while at the campground. Their campsite was not a suitable place for E.C.-K because there was trash all over the ground, the mother's dog had no food or water accessible, and the dog was often "tied outside in the heat." But within one month of being unsuccessfully discharged from Hope House and moving to the campground, the mother returned to Jefferson County Jail. The rest of the case, she spent moving back and forth between jail and the halfway house.

When the father ended their relationship and returned to live with his wife, the mother became obsessive. HHS received complaints that the mother was "stalking" and harassing the father and his wife. At one point, the mother refused to leave his property and the father called the police to remove her. He threatened to pursue a no-contact order if she persisted. When her HHS provider tried to visit with the mother about E.C.-K., the mother was more interested in hearing about the father than about her own progress or how E.C.-K. was doing. The mother told the HHS provider "that if [the father] will not come home to her . . . , then she will no longer allow [him] any contact with [E.C.-K.]" and argued that reasonable efforts were not being made "to reunify me and [the father]." The provider attempted to redirect the conversation and clarify the purpose of "reasonable efforts," but she gave up because the mother "appeared to be under the influence of a mind altering substance." During another visit, the HHS provider attempted to explain to the mother how her "toxic relationship" with the father had impacted her ability to care for E.C.-K. But the mother was not interested, stating that "she and [the father] can have new children, however, there is only one [Father]."

In October 2023, the State petitioned for termination of parental rights. Soon after, the mother's probation was revoked. After violating "8 of the 20 facility rules and regulations, including stealing from her co-residentials, being in possession of contraband," socializing while pretending to be at work, and failing to maintain employment, the mother was removed from the halfway house. She returned to Jefferson County Jail. While in jail, the mother did not address her substance-use and mental-health concerns. Though she participated in both a substance-use evaluation and a psychological assessment, she did not follow through with the recommendations. She was recommended outpatient treatment for substance use and "intensive," "long-term treatment in a group home facility with other women" for mental health. But she "refus[ed] substance abuse treatment services while incarcerated" and "stopped participating in mental health services after she was asked to leave Hope House" back in May 2023.

From the start, the mother was at odds with the department, and this continued to escalate. By the time she returned to jail, the mother fully declined contacts with HHS providers, blocking their phone numbers and asking jail staff to remove them from the list of approved visitors. HHS created a standing weekly appointment at 9:00 a.m. to meet with the mother in jail, but she "refused to get out of bed," stating, "mornings are not good times to talk to me Im not awake enough for it." But despite rejecting most services, the mother did accept visits with E.C.-K. The HHS provider testified that at these visits, E.C.-K. didn't "really recognize his mother" and that "[t]here is no bond there." Because of jail policies, the mother was allowed one thirty-minute visit per week, during which the mother and E.C.-K. were separated by glass.

On January 31, 2024, the mother returned to the halfway house. The mother's visits were increased to two hours per week, and they were held in person. But on February 6, the day before the termination hearing, the mother's probation officer alleged she violated probation for "sexual misconduct" occurring at the facility. The probation officer testified that the mother "could be facing prison" or "contempt or return to the [halfway house]."

The mother also testified at the termination hearing that she had been sober for "over seven months" but still had not completed substance-use treatment. She also re-engaged with mental-health services by setting up counseling and medication management appointments. And she acknowledged her lack of housing and employment, but noted those were both areas she was working on. Instead of termination, the mother requested more time to work toward reunification.

The juvenile court terminated both the mother's and the father's parental rights to E.C-K. Only the mother appeals, asking us to reverse the termination and grant her additional time.

## II.    Review.

Our review of termination-of-parental-rights proceedings is de novo. *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000). While not binding, we give weight to the juvenile court's fact findings, especially those regarding witness credibility. *Id.*

## III.    Discussion.

Iowa courts use a three-step analysis to review terminations, in which we consider whether (1) the statutory grounds for termination have been satisfied, (2) termination is in the child's best interests, and (3) we should exercise a

permissive exception to decline termination. *In re A.S.*, 906 N.W.2d 467, 472–73 (Iowa 2018). While we address each argument in turn, the child's best interests are our primary concern. *In re J.H.*, 952 N.W.2d 157, 166 (Iowa 2020).

*A. Reasonable Efforts.*

The mother first argues that HHS did not make reasonable efforts at reunification, *see* Iowa Code § 232.102(6) (requiring the department to "make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child"), and argues that HHS should have offered "make-up" visits for the time she was incarcerated. But the mother fails to cite where in the record she requested such "make-up" visits and her recommendation of an appropriate solution. *See In re C.H.*, 652 N.W.2d 144, 148 (Iowa 2002) (requiring a parent to challenge reasonable efforts "at the proper time" or risk "waiv[ing] the issue"); *In re T.S.*, 868 N.W.2d 425, 442 (Iowa Ct. App. 2015) ("While the State has an obligation to provide reasonable services to preserve the family unit, it is the parent's responsibility 'to demand other, different, or additional services *prior* to the termination hearing.'" (citation omitted)). We therefore find the mother's argument waived. *See C.H.*, 652 N.W.2d at 148. Further, HHS is not required to "make up" visits that were missed as a result of the mother's own actions. *See In re A.W.*, No. 18-0466, 2018 WL 2722789, at *3 n.6 (Iowa Ct. App. June 6, 2018) (finding a parent "cannot complain about the unavailability of services when his own criminal conduct" resulted in the consequences).

*B. Statutory Grounds for Termination.*

The mother next contends that the statutory grounds for termination have not been met. The juvenile court terminated the mother's rights under

section 232.116(1)(g) and (h). "When the juvenile court terminates parental rights on more than one statutory ground, we may affirm the juvenile court's order on any ground we find supported by the record." *In re A.B.*, 815 N.W.2d 764, 774 (Iowa 2012). We therefore confine our analysis to section 232.116(1)(h).

The court may terminate parental rights under section 232.116(1)(h) if it finds all of the following:

> (1) The child is three years of age or younger.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least six months of the last twelve months, or for the last six consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102 at the present time.

Iowa Code § 232.116(1)(h). The mother purports to challenge the fourth element: whether the child could be returned to the parent's care at the time of termination. *See* Iowa Code § 232.116(1)(h)(4); *A.S.*, 906 N.W.2d at 473 (interpreting "at the present time" to mean the time of the termination hearing). But she simultaneously acknowledges "that the child could not returned to her custody that day." Accordingly, we find that the statutory grounds for termination have been conceded and are therefore satisfied.

*C. Best Interests Consideration.*

The mother next contends that termination is not in E.C.-K.'s best interests because her incarceration is the primary barrier to reunification. In determining best interests, we "give primary consideration to the child's safety, to the best placement for furthering the long-term nurturing and growth of the child, and to the

physical, mental, and emotional condition and needs of the child." Iowa Code § 232.116(2). The "defining elements" of the best-interests analysis are the child's safety and "need for a permanent home." *In re H.S.*, 805 N.W.2d 737, 748 (Iowa 2011) (citation omitted).

We agree with the juvenile court's finding that termination is in the best interests of E.C.-K. The mother has consistently failed to address the concerns that sparked the department's involvement. *See In re A.G.*, No. 18-1161, 2018 WL 6131920, at *3 (Iowa Ct. App. Nov. 21, 2018) ("It is not in the best interest of the child to return to a parent who refuses to address [HHS's] primary concerns." (cleaned up)). While she testified she has been sober for seven months, her progress is recent. She has never completed substance-use treatment nor proven that she can maintain sobriety outside of an institutionalized setting. As to her mental health, the mother waited until the last minute to begin scheduling appointments. *See C.B.*, 611 N.W.2d at 495 ("Time is a critical element. A parent cannot wait until the eve of termination . . . to begin to express an interest in parenting."). In the past, the mother's priorities were not E.C.-K.'s well-being, but rather in rekindling her relationship with the father and blaming the department for her failures. This resulted in either noncompliance with or outright rejection of services.

While we acknowledge the mother's difficulties in developing a bond with E.C.-K. during jail visits, we do not "protect[] an incarcerated parent's rights at the expense of a child's best interest." *In re B.H.A.*, 938 N.W.2d 227, 233 (Iowa 2020). The mother "cannot use [her] incarceration as a justification for [her] lack of a relationship with the child," especially "when the incarceration results from a

lifestyle that is chosen in preference to, and at the expense of, a relationship with a child." *Id.* at 234 (citation omitted). At the termination hearing, the mother conceded that her incarceration resulted from her own actions. She violated her probation several times, refused to follow facility rules and regulations, and was dishonest with the department about her conduct. Further, her most recent probation violation likely has imminent consequences that will impact her ability to resume care of the child.

But in his mother's absence, E.C.-K. developed a bond with his foster family, with whom he has resided since his removal from parental custody. *See In re M.W.*, 876 N.W.2d 212, 225 (Iowa 2016) (finding the child's integration into the foster placement supports termination). "His foster parents adore him and have provided him with excellent care since his placement in that home" and have expressed a desire to adopt him. E.C.-K. "lights up" around his foster parents, who he refers to as "Momma" and "Mom." After a year of instability, we find that E.C.-K. deserves to achieve permanency and therefore affirm the juvenile court's finding that termination is in his best interests.

*D. Extension of Time.*

Finally, the mother asks for a six-month extension, which she claims would provide sufficient time for her to resume custody. *See* Iowa Code § 232.104(2)(b) (permitting the juvenile court to grant additional time to work toward reunification if "the need for removal . . . will no longer exist at the end of the additional six-month period"). But based on the mother's previous lack of progress, we are not convinced that another six months would result in a different outcome. *See C.B.*, 611 N.W.2d at 495 (finding "past performance" is reflective "of the quality of

the future care that parent is capable of providing" (citation omitted)). E.C.-K. was removed from parental custody just twelve days after his birth and he has waited nearly his entire life to achieve permanency. We cannot delay that permanency with the hope that the mother will begin to change. *See In re A.M.*, 843 N.W.2d 100, 112 (Iowa 2014) ("It is well-settled law that we cannot deprive a child of permanency . . . by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child." (citation omitted)). This is especially true given the mother's rejection of and overall lack of interest in engaging with HHS services. We therefore find an additional six months would not reunify the mother and E.C.-K. but only deprive him of permanency longer.

## IV.    *Disposition.*

Because we find the statutory grounds are satisfied, termination is in the best interests of the child, and additional time is not warranted, we affirm termination of the mother's parental rights.

**AFFIRMED.**